## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT CHARLES CLASS A, L.P., individually on behalf of itself and all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>NATWEST MARKETS PLC, NATWEST MARKETS SECURITIES INC. (F/K/A RBS SECURITIES INC.) AND  JOHN DOE 1-50<br>                              Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br><br>Dated: December 23, 2021 |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE ...........................................................................................3

THE PARTIES......................................................................................................................4

FACTUAL ALLEGATIONS ...............................................................................................6

I.      RELEVANT FACTUAL BACKGROUND ..............................................................6

II.     EVIDENCE OF DEFENDANTS' MISCONDUCT...............................................14

III.    DEFENDANTS HAVE A SUBSTANTIAL PRIOR HISTORY OF SIMILAR
        MISCONDUCT IN THE SECURITIES AND COMMODITIES MARKETS ...............22

CLASS ACTION ALLEGATIONS ...................................................................................24

PRAYER FOR RELIEF .....................................................................................................31

DEMAND FOR JURY TRIAL ..........................................................................................32

Plaintiff Robert Charles Class A, L.P., and ("Plaintiff"), individually and on behalf of all others similarly situated, by its attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge. That investigation included reviewing and analyzing information concerning the U.S. Treasuries market, which Plaintiff (through its counsel) obtained from, among other sources: (1) reports about the U.S. Treasuries market; (2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Treasuries Securities and Treasury Futures; (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the DOJ; and (4) Defendants' SEC filings and other public reports about Defendants.:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action for damages against Defendants NatWest Markets PLC, NatWest Markets Securities Inc. ("NWMSI" f/k/a RBS Securities Inc.) and John Doe 1-50 (collectively, "Defendants") to redress injury caused by Defendants' intentional manipulation of secondary cash market of bills, notes, and bonds issued by the United States Department of the Treasury ("Treasury Securities"), and the market for Treasury Securities for future delivery and options on those contracts ("Treasury Futures and Options"),[1] that traded on various platforms including, but not limited to, United States-based exchanges, such as the Chicago Mercantile Exchange ("CME") and Chicago Board of Trade ("CBOT"),  during the period of at least January 1, 2008 through December 31, 2018 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* (the "CEA"), and common law.

---

[1]      These include futures contracts that were standardized agreements for the purchase and sale of U.S. Treasury Securities for future delivery, including futures contracts for the five-year U.S. Treasury note, 10-year U.S. Treasury note, and 30-year U.S. Treasury bond, as well as the Ultra U.S. Treasury bond futures contract (the "Ultrabond").

2.     Treasury Securities are marketable debt securities issued by the United States government that earn interest (known as coupon payments) through maturity when the "par" amount (equal to the principal) is returned to the owner.  Treasury Futures are standardized agreements to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

3.     On December 21, 2021, Defendant NatWest Markets Plc ("NWMP") entered into a Plea Agreement with the United States Department of Justice Criminal Division, Fraud Section and the United States Attorneys' Office for the District of Connecticut ("USAO-CT"). NWMP pleaded guilty to criminal wire fraud and securities fraud charges for engaging in unlawful trading activities in the markets for U.S. Treasury Futures and the secondary (cash) market for U.S. Treasury Securities (Treasury Securities and Treasury Futures, collectively, "U.S. Treasuries").[2]

4.     U.S. District Judge Omar A. Williams accepted the guilty plea and sentenced NWMP to pay approximately $35 million in a criminal fine, restitution, and forfeiture.  NWMP also will serve three years of probation and will agree to the imposition of an independent compliance monitor.[3]

5.     Defendants used a manipulative device known as "spoofing," whereby its employees placed orders for Treasury Futures and Treasury Securities to send false and illegitimate supply and demand signals to an otherwise efficient market and then canceled those orders before execution.  As a result, Defendants caused prices in both markets to be artificial throughout the Class Period to benefit their trading positions financially, at the expense of other investors, like Plaintiff and the Class.

---

[2]     Press Release, Dep't of Just., NatWest Markets Pleads Guilty to Fraud in U.S. Treasury (Dec. 21, 2021), https://www.justice.gov/opa/pr/natwest-markets-pleads-guilty-fraud-us-treasury-markets.

[3]     *Id*.

6.      Defendants acknowledged that during the Class Period, Defendants and their traders "knowingly, willfully, and with the intent to defraud placed orders to buy and sell certain U.S. Treasuries with the intent to cancel those orders before execution . . . including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasuries."[4]

7.      Pursuant to the terms of the plea agreement, NatWest pled guilty because "it is guilty of the charges contained in the Information."  It "admit[ted], agree[d], and stipulat[ed] that the factual allegations set forth in the Information and [the Statement of Facts] are true and correct, that it is responsible for the acts of its officers, employees, and agents described in the Information and [the Statement of Facts], and that Information and [the Statement of Facts] accurately reflect [NatWest]'s criminal conduct."[5]

8.      Because Defendants' manipulation was concealed and secretive, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337(a) because this action arises under Section 22 of the CEA, 7 U.S.C. §25. This Court also has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

---

[4]      Information at ¶9, *U.S. v. NatWest Mkts. PLC*, No. 3:21-cv-187 (D. Conn. Dec. 21, 2021), https://www.justice.gov/opa/press-release/file/1457981/download (hereinafter "Information").

[5]      Plea Agreement at ¶14, *U.S. v. NatWest Mkts. PLC*, No. 3:21-cv-187 (D. Conn. Dec. 21, 2021), https://www.justice.gov/opa/press-release/file/1457986/download (hereafter "Plea Agreement").

10.     Venue is proper in the District of Connecticut, pursuant to 28 U.S.C. §1391(b), (c), and (d), and Section 22 of the CEA, 7 U.S.C. §25(c).  One or more of the Defendants was head quartered, resided, transacted business, were found, or had agents in the District.  NWMSI is headquartered in Stamford, Connecticut and the criminal matter against NatWest is located at the New Haven division of this District. *See U.S. v. NatWest Mkts. PLC*, No. 3:21-cv-187 (D. Conn. Dec. 21, 2021). Further, Stamford, Connecticut is a major hub of the Treasury Securities and Treasury Futures trading activity at issue in this litigation and is the location of key witnesses, documents, and other evidence.

11.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint. Treasury Futures and the underlying securities are commodities and financial products that trade in interstate commerce in the United States.

## THE PARTIES

### I.   PLAINTIFF

12.     Plaintiff Robert Charles Class A, L.P. ("RCA") was at all relevant times a California limited partnership.  RCA transacted in Treasury Futures and Options during the Class Period on the CBOT and was injured and suffered losses from trading at artificial prices caused by Defendants' manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff RCA the ability to transact in a truly free market that without manipulation.  As a direct and proximate result of Defendants' conduct, Plaintiff RCA was harmed and suffered economic injury.

## II.   DEFENDANTS

### A. NatWest Markets PLC

13.     Defendant NatWest Markets PLC ("NWMP" formerly known as The Royal Bank of Scotland plc) is a global banking and financial services company that is headquartered in London, United Kingdom.

### B. NatWest Markets Securities Inc.

14.     Defendant NatWest Markets Securities Inc. ("NWMSI," formerly known as RBS Securities Inc.) is a Delaware corporation with its headquarters at 600 Washington Boulevard, Stamford, Connecticut 06901.

15.     NWMSI operates as a wholly owned subsidiary of NWMP.  NWMSI is registered with the SEC as a broker-dealer.  NWMSI is also a registered futures commission merchant ("FCM") with the U.S. Commodity Futures Trading Commission ("CFTC"). During the Class Period, NWMSI, including its predecessors, served as a primary dealer of U.S. Treasuries and transacted in U.S. Treasury-based instruments, including Treasuries Securities and Treasury Futures.

16.     Collectively, NWMSI and NWMP are referred to as "NatWest."

### C. John Doe Defendants

17.     Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of U.S. Treasuries.  The defined term "Defendants" also includes John Doe Defendants.

18.     The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

19.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

20.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

### I.     RELEVANT FACTUAL BACKGROUND

#### A.     Overview of Treasury Securities

21.     **U.S. Treasury Securities**.  The U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions.  This debt is subject to fixed terms, *e.g.*, two-year, five-year, 10-year, and 30-year terms, at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds.  Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in the secondary cash market at prevailing prices from dealers in government securities.  Many instruments bought and sold by market participants are also linked to Treasury yields/prices.  As of April 2020, there were more than $20 trillion in U.S. Treasury Securities outstanding.[6]

---

[6]     *Monthly Statement of the Public Debt of the United States*, DEP'T OF TREASURY, BUREAU OF THE FISCAL SERV. (Dec. 31, 2020), https://www.treasurydirect.gov/govt/reports/pd/mspd/2020/opds122020.pdf.

22. **U.S. Treasury Bills**. U.S. Treasury bills ("T-Bills") are Treasury bills with maturities ranging from four (4) weeks to fifty-two (52) weeks. T-Bills are purchased at a discount to par value (*i.e.*, face value) as they do not pay interest prior to maturity.

23. **U.S. Treasury Notes**. U.S. Treasury notes ("T-Notes") have maturities between one-year to 10-years and are issued with maturities of two (2), three (3), five (5), seven (7), and ten (10) years. T-Note interest is paid semiannually, and the principal is paid upon maturity.

24. **U.S. Treasury Bonds**. U.S. Treasury bonds ("T-Bonds") are Treasury bonds with original maturities of greater than ten (10) years at time of issuance. T-Bond interest is paid semiannually, and the principal is paid upon maturity.

25. T-Bills, T-Notes, and T-Bonds have two sides: the "long" side, which is the buy side of the security, and the "short" side, which is the sell side of the security. T-Notes and T-Bonds are priced based on their par value, the public demand for the debt, prevailing interest rate yields, and coupon rate. The par value is the face value of the T-Note or T-Bond. The coupon rate is the annual interest rate, as a percentage of par value, paid on a T-Note or T-Bond as determined by the U.S. Treasury Department. For example, a $1,000,000 T-Note with a coupon rate of 3% will pay $30,000 a year total, paid as two $15,000 semiannual payments.

### B. Overview of Treasury Futures

#### 1. Overview of Key Terms

26. **Commodity Futures Contract**. A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price and time in the future. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based. The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index. Pursuant to Section 5 of the CEA, 7 U.S.C. §7,

Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

27.     **"Long" and "Short" Futures**.  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  Treasury Futures are deliverable upon expiry.  However, futures contracts can also be offset before expiration.

28.     **Offset by Trading**.  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This sale of one contract offsets or liquidates the earlier purchase of another contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

29.     **Options Contract**.  An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury Futures).

30.     **Call Option**.  A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price).  Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price.  The buyer (the "long or "option holder") of one call option wants the value of the underlying commodity to increase so

that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

31. **Put Options**. A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay at or above the strike price of the put option so that the seller of the option would not be forced to buy the underlying futures contract at an above-market price.

32. **U.S. Treasury Futures**. Treasury Futures are deliverable baskets of U.S. Treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[7] Treasury Futures provide market participants the ability to manage their interest rate exposure. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

33. Since the first Treasury Futures products were launched over forty (40) years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts are still traded through open outcry. During the Class Period, U.S. Treasury Futures traded on the CBOT

---

[7]     As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options on CBOT Treasury Futures contracts, unless otherwise noted.

included, among others: (i) 2-year T-Note Futures; (ii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond Futures; (v) Ultra 10-year T-Note Futures; and (vi) Ultra US Treasury Bond Futures.  Options are generally available on U.S. Treasury Futures contracts. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.  According to the CME, in February 2021, the average daily volume was 8.4 million Treasury Futures contracts and 1.5 million Options on Treasury Futures contracts.[8]

### 2.    The CME Group

34.    The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges.  Its global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In 2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a Designated Contract Market offering products subject to CBOT rules and regulations.  CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering.  Today, the CME Group is made up of at least four exchanges, CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes.

35.    The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts.  Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day.  CME Globex is subject to CME rules including those that (a) govern the conduct of CME

---

[8]    *CME Group Exchange ADV Report - Monthly (February 2021)*, CME GRP., https://www.cmegroup.com/daily_bulletin/monthly_volume/Web_ADV_Report_CMEG.pdf.

Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading.

36.     CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels."  An "order" is a request to buy (a "bid") or sell (an "offer" or "ask").  The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

37.     Quotes to buy or sell are entered into the order book, which allows market participants to see the visible number of orders and the visible total number of contracts that all traders are actively bidding or offering at a given price level.  The identities of traders who submit quotes into the order book are anonymous.  Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.  Traders can view the aggregate resting contracts and orders up to the 10th-bid and 10th-ask levels.  This combined bid and ask information is often referred to as the visible order book and represents the visible market depth.  Traders use the information contained in the order book to make trading decisions.

38.     An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact.  Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower.  Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

39.     By contrast, a "passive order" does not give up the spread in price.  On the buy side of the market, a passive buy order is placed at the best-bid price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell.  A passive sell order would be placed at the best-offer/ask price or higher.  Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

40.     CBOT also allows traders to place iceberg orders.  In an iceberg order, the total amount of the order is divided into a certain pre-set quantity and only that quantity is visible to other market participants, with the remainder of the order not visible to other market participants.  Whenever the visible portion of the order is filled, the same pre-set quantity of the remaining portion automatically becomes visible.  This process repeats until the remainder of the order is either executed or canceled. The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed.

41.     CME Globex bids and offers for outright futures are matched according to an algorithm on a first-in, first-out ("FIFO") basis.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

### C. How Spoofing Works

42.     "Spoofing" is a manipulative trading device used to create artificial prices in markets.  It entails submitting and/or canceling bids or offers with the intent to create an artificial

understanding of the true nature of supply and demand in the market. By doing so, the spoofed orders will move the market price upwards or downwards.[9]

43.     For example, if a trader wants to buy at an artificially lower price, he may place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy Treasury Futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell.  The trader will then attempt to spoof prices lower by placing one or more large orders – orders the trader never intends to execute – to *sell* a substantial amount of the same contract on the opposite side of the market. These orders are called the "spoof orders."  Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled.  These large orders falsely signal that investors are selling their Treasury Futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order.  The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

44.     The same technique can also be used in reverse to manipulate prices artificially higher.  For example, a trader can place an order to sell Treasury Futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of the trader's initial sell order.

---

[9]     Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

45.      In each instance, the trader profits because spoofing allows the trader to buy Treasury Futures contracts below the current market price or to sell Treasury Futures contracts above the current market price.  The CFTC has described spoofing as "a particularly pernicious example of bad actors seeking to manipulate the market through the abuse of technology."[10]  James McDonald, the CFTC's former Director of Enforcement, has remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets – it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[11]

46.      Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims.  As alleged here, Defendants' use of spoofing and other manipulative conduct harmed Plaintiff and the Class members who purchased or sold Treasury Futures at artificial prices during the Class Period.

## II.    EVIDENCE OF DEFENDANTS' MISCONDUCT

### A.    Overview of Government Settlement

47.      On December 21, 2021, Defendant NWMP entered into a Plea Agreement with the DOJ and USAO-CT to resolve criminal charges that they defrauded other market participants by way of a consistent pattern of manipulative conduct, including at least hundreds of episodes of

---

[10]      James M. McDonald, Enforcement Director, Commodity Futures Trading Comm'n, Statement of CFTC Enforcement Director James McDonald (Jan. 29, 2018), https://www.cftc.gov/PressRoom/SpeechesTestimony/ mcdonaldstatement012918.

[11]      James M. McDonald, Enforcement Director, Commodity Futures Trading Comm'n, Enforcement trends at the CFTC, NYU School of Law: Program on Corporate Compliance & Enforcement (Nov. 14, 2018), https://www.cftc.gov/PressRoom/SpeechesTestimony/ opamcdonald1.

spoofing the U.S. Treasury Futures market and secondary cash market for U.S. Treasuries Securities.

48.    Pursuant to the terms of the Plea Agreement, NWMP paid approximately $35 million in criminal monetary penalties, criminal disgorgement, and restitution.[12]

49.    In the Plea Agreement, Defendants admitted that during the Class Period, Defendants and their employees:

> knowingly, willfully, and with the intent to defraud placed orders to buy and sell certain U.S. Treasuries with the intent to cancel those orders before execution ("Spoof Orders"), including in an attempt to profit  by  deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasuries.[13]

50.    Pursuant to the Plea Agreement, Defendant NWMP also "admit[ted], agree[d], and stipulate[d] that it is responsible for the acts of its officers, employees, and agents described in the Information, and [the Statement of Facts] and that Information and [the Statement of Facts] accurately reflect [NatWest]'s criminal conduct."[14]

51.    Defendant NWMP also expressly agreed that it "shall not, through present or  future attorneys, officers, directors, employees, [or] agents . . . make any  public  statement,  in litigation or otherwise, contradicting the acceptance of responsibility by [NWMP]."[15]

---

[12] Plea agreement, ¶ 20.

[13]  Information, ¶9.

[14] Plea Agreement, ¶ 14.

[15]  Plea Agreement, ¶ 32.

**B.     NatWest Is an Active Participant in the U.S. Treasuries Market**

52.     During the Class Period, Defendant NWMSI, NatWest's FCM division, provides trade execution and clearing services to a variety of customers who transact in exchange-traded futures and options on futures contracts.[16]

53.     During the Class Period, Defendant NWMSI ranked among the world's largest FCMs.[17]

54.     During the Class Period, Defendants' U.S. Treasuries Desk included at least a NWMP trader in London ("Trader -1"), and a NWMSI trader in Stamford ("Trader-2"), and two NWMP traders in Singapore ("Trader-3" and "Trader-4").[18]

**C.     Defendants' Manipulation of U.S. Treasuries**

55.     From approximately January 2008 until December 2018, NatWest manipulated the prices of U.S. Treasury Futures on CBOT and prices of U.S. Treasury Securities on the secondary cash market to illegally increase their trading profits, at the expense of Plaintiff and the Class.

56.     On hundreds of occasions, NatWest traders knowingly and intentionally placed orders to buy and sell U.S. Treasuries with the intent to cancel those orders before execution (the

---

[16] *See* 2018 NatWest Markets Securities Inc. Disclosure Document Pursuant to Commodity Futures       Trading       Commission       Rule       1.55(K),       available       at: https://financedocbox.com/Mutual_Funds/116247392-Natwest-markets-securities-inc-disclosure-document-pursuant-to-commodity-futures-trading-commission-regulation-1-55-k.html (listing customer categories including hedge  funds,  asset managers,  pension funds, insurance  companies,  corporations, and banks,).

[17] Based on CFTC data, NMSI ranked as one of the thirty largest FCM as of December 31, 2018. *See* 2019 Top FCMs, ManagedFuturesInvesting.com (Feb. 19, 2019), available at: https://www.managedfuturesinvesting.com/2019-top-fcms/.

[18]     Information, ¶¶7-8.

"Spoof Orders").  In placing the Spoof Orders, NatWest traders were acting within the scope of their employment as employees and agents of NatWest and with the intent to benefit NatWest.[19]

57.     By placing Spoofing Orders, NatWest "intended to inject materially false and misleading information about the genuine supply and demand for U.S. Treasuries into the market and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand."[20]

58.     Defendants did so to cause artificial Treasury Futures prices and move prices in a direction that did not accurately reflect market-based forces of supply and demand.

59.     By placing Spoof Orders to **buy** Treasury Futures, NatWest intended to falsely signal to the market that there was increased demand, thus driving up the prices of those products.[21]

60.     Conversely, by placing Spoof Orders to **sell** Treasury Futures, NatWest intended to falsely signal to the market that there was an increased supply, thus driving down the prices of those products.[22]

61.     Market participants traded in a market that appeared, and they believed, to be subject to a legitimate change in supply or demand.  As a result, Defendants' manipulation caused market participants to enter sell orders below, or buy orders above, a competitive market price.[23]

62.     In total, during the Class Period, NatWest's manipulation caused at least $6,761,967 to other U.S. Treasuries market participants, specifically, $6,165,913 in losses to U.S.

---

[19]     *Id.*, ¶16.

[20]     *Id.*, ¶12.

[21]     *Id.*, ¶14.

[22]     *Id.*, ¶15.

[23]     *Id.*, ¶13.

Treasury futures contracts market participants and $596,054 in losses to U.S. Treasuries Securities market participants.[24]

63.     The Information also include representative examples of the hundreds of instances of Defendants' manipulative trading:

### 1.     June 24, 2013 – 10-year U.S. Treasury Note Futures Contract

64.     On June 24, 2013, at 3:45:13.965 a.m.,[25] a NatWest London-based Treasuries Trader-1 placed an iceberg order to by 100 10-year U.S. Treasury note futures contract at a price of $125.40625, displaying two contracts to the market.  Next, 10.156 seconds later, Trader-1 placed a Spoof Order to sell 1,000 10-year U.S. Treasury note futures contracts at $125.421875 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Then, 25 milliseconds later, Trader-1's iceberg order to buy was filled in its entirety.  Last, 3.663 seconds later, Trader-1 cancelled his Spoof Order in its entirety.[26]

### 2.     July 25, 2012 – Ultrabond Futures Contract

65.     On July 25, 2012, at 10:05:01.416 a.m., NatWest Stamford-based Trader-2 placed a Primary Order to buy 10 Ultrabond futures contracts at $175.90625.  158.716 seconds later (*i.e.*, nearly three minutes), Trader-2 placed a Spoof Order to sell 500 Ultrabond futures contracts at $175.93750 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Then, 24 milliseconds later, Trader-2's Primary Order to

---

[24]     *Id.*, ¶33.

[25]     All dates, times, and numbers are approximate.  Unless otherwise specified, all times are in Central Standard Time or Central Daylight Time.

[26]     Information, ¶22.

buy was filled in its entirety.  Last, 858 milliseconds later, Trader-2 canceled his Spoof Order in its entirety.[27]

### 3. May 14, 2014 – Ultrabond Futures &30 Year U.S. Treasuries Bonds (Cross Manipulation of the Cash Market)

66.     On May 14, 2014, at 12:33:44.593 p.m., NatWest Trader-2 placed a Spoof Order to buy 210 Ultrabond futures contracts at $149.59375, with the intent to create the illusion of demand in the futures market, deceive other market participants, and artificially move the correlated cash market price higher.  Trader-2 canceled the Spoof Order in its entirety 3.131 seconds later.  In the interim, in the cash market, Trader-2 filled Primary Orders to sell a total of 2,000,000 30-year U.S. Treasury bonds.[28]

### 4. July 2, 2018 - 10-year U.S. Treasury Notes

67.     On July 2, 2018, at 5:28:48.789 a.m. Coordinated Universal Time, NatWest Singapore-based Trader-3, placed Primary Orders to sell a total of 50,000 10-year U.S. Treasury notes at $100.234375.  Next, 799.767 seconds later (*i.e.*, over 13 minutes), Trader-3 willfully placed Spoof Orders to buy a total of 500,000 10-year U.S. Treasury notes at $100.21875 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Then, one and two milliseconds later, his Genuine Orders to sell were filled in their entirety.  Last, 2.627 seconds later, Trader-3 canceled his Spoof Orders in their entirety.[29]

---

[27]     *Id.*, ¶24.

[28]     *Id.*, ¶25.

[29]     *Id.*, ¶26.

### 5. Other Spoofing Instances

68.     In addition to Traders 1-4, each of whom placed Spoof Orders on numerous occasions, a NWMSI supervisor in Stamford ("Supervisor-1") also placed orders on three occasions in 2018 that had the potential to distort the U.S. Treasury Securities cash market.[30]

69.     In each of the above representative examples, NatWest successfully manipulated the Treasury Futures market and the Treasury Cash market to illegally increase their trading profits, at the expense of Plaintiff and the Class.

70.     Defendants manipulated U.S. Treasuries prices throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold at artificially inflated or deflated prices.

### D.     Defendants Knowingly Defrauded the Market and Engaged in Activities to Conceal Their Misconduct

71.     Trader-1 referenced his deceptive trading practices in electronic chats with colleagues at NatWest, especially when his Spoof Orders were filled by other market participants despite his intentions and before he could cancel them.  For instance, in a chat on June 13, 2011, he explained to a colleague that, in order to execute a Primary Order to sell, he had placed a buy order (a "bid") into the market. The colleague asked, "why you try and bid? to spoof?"  Trader-1 answered: "y[es] . . . i was doing lot of that last week & was saying myself, gonna get caught soon, should stop."   In a chat two weeks later, on June 29, 2011, Trader-1 mentioned to the same colleague that he had been "cauight [sic] spoofing few times," and in a chat on August 15, 2012, he complained that he had "dropped little $ alraedy [sic] this am spoofing."[31]

---

[30]     *Id.*, ¶27.

[31]     *Id.*, ¶23.

72.     On July 26, 2018, a market participant complained to NWMP about trading activity in the cash market during Asia trading hours.  In response, NWMP commenced an internal review, which led to the suspension and ultimate termination of both of the Singapore-based traders, Trader-3 and Trader-4.[32]

73.     The same day, Supervisor-1 called Trader-3 and described the complaint in the following terms:

> The basic complaint . . . is they're trying to run a business that's based on real market signals . . . and you're giving them fake market signals.  We could debate whether what you are doing is fair or not fair . . . .  In a Darwinian sense I don't have any issue with it . . . but the fact is they do provide liquidity to . . . to the global business . . . and if they cut us off because of your activity . . . then I do have a problem with it. . . .  [S]omeone who really wants to see you out of a job could make a strong argument of spoofing and then we go down the path of the nature of spoofing and whether you have a job after it as well.[33]

74.     Later in that call, Supervisor-1 advised Trader-3 on how to hide his fraudulent scheme from NWMP's compliance personnel:

> [S]end an e-mail to [Supervisor-1's supervisor], me, [and another trader]. . . . Just email the three of us and say you and I spoke and you know just that the trading behavior, just don't go into details, just say your trading style is gonna be adjusted to, put something in the e-mail that . . . makes it clear to all three of us, without saying anything that is going to make . . . some surveillance person say "hey I wanna get involved in what they're talking about."  Just say, "[Supervisor-1] and I spoke about best practices and you know we're all good going forward," or something like that.  You know what I mean like just, just you could even make it say, "[Supervisor- 1] and I spoke last night and we are all set going forward," right, just put something in writing that says I got the message.  Relay this to [Trader-4] . . . and we're all set and I think I'll get you turned on you know in a few days.[34]

---

[32]     *Id.*, ¶28.

[33]     *Id.*, ¶29.

[34]     *Id.*, ¶30.

E.   **Defendants Failed to Supervise Its U.S. Treasuries Desk**

75.   NatWest's had an inadequate and ineffective compliance program and internal controls as their compliance functions failed to detect NatWest's traders' manipulative trading throughout the Class Period.

III.   **DEFENDANTS HAVE A SUBSTANTIAL PRIOR HISTORY OF SIMILAR MISCONDUCT IN THE SECURITIES AND COMMODITIES MARKETS**

76.   On February 5, 2013, Defendant NWMP (then called The Royal Bank of Scotland plc) entered into a deferred prosecution agreement ("DPA") with the Department of Justice for criminal violations in connection with manipulation of the benchmark London Interbank Offered Rate from 2006 to 2010.[35]  The DPA requires NWMP to admit and accept responsibility for its misconduct as described in an extensive statement of facts, to continue cooperating with the Justice Department in its ongoing investigation and to pay a $100 million penalty.[36]  Defendant NWMP's Japanese subsidiary also pled guilty for related manipulation.[37]

77.   On a May 20, 2015, Defendant NWMP (then called The Royal Bank of Scotland plc) pleaded guilty to manipulation of the Foreign Exchange market from December 2007 until at least April 2010 and paid a fine of $395 million and paid an additional $50 million fine.[38]

78.   On October 25, 2017, Defendant NWMSI entered into a non-prosecution agreement regarding fraudulent misrepresentations in the purchase and sale of collateralized loan

---

[35]   Deferred Prosecution Agreement, U.S v. The Royal Bank of Scot. Plc (D. Conn. Feb. 5, 2013), https://www.justice.gov/atr/case-document/file/509081/download.

[36]   *Id.*

[37]   Press Release, Dep't of Just., RBS Securities Japan Limited Agrees to Plead Guilty in Connection with Long-Running Manipulation of Libor Benchmark Interest Rates (Feb. 6, 2013), https://www.justice.gov/opa/pr/rbs-securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor.

[38]   Press Release, Dep't of Just., Five Major Banks Agree to Parent-Level Guilty Pleas (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

obligations and residential mortgage-backed securities transactions from 2008 to 2013.[39] The agreement required NWMSI to pay a monetary penalty of $35 million and pay more than $9 million of restitution to victim customers.[40]

79.     On February 3, 2017, The U.S. Commodity Futures Trading Commission (CFTC) issued an Order settling charges against Defendant NWMP (then called The Royal Bank of Scotland plc) for manipulation of the ISDAFIX benchmark between 2007 and 2012 and requiring NWMP to pay an $85 million civil monetary penalty.[41]

80.     On August 14, 2018, Defendants' parent company (The Royal Bank of Scotland Group plc) entered a $4.9 billion civil settlement with the United States Attorney's Office for the District of Massachusetts resolving an investigation into alleged misrepresentations by the Defendant's U.S. affiliates in underwriting and issuing residential mortgage-backed securities between 2005 and 2008.[42]

81.     On October 7, 2021, National Westminster Bank Plc, a U.K. commercial bank affiliate of the Defendant NWMP pleaded guilty in the United Kingdom for violating U.K. Money

---

[39]     Press Release, Dep't of Just., RBS Securities Inc. Agrees to Pay $35 Million Penalty Related to Securities Fraud Scheme (Oct. 26, 2017), https://www.justice.gov/usao-ct/pr/rbs-securities-inc-agrees-pay-35-million-penalty-related-securities-fraud-scheme.

[40]     *Id.*

[41]     Press Release, Commodities Futures Trading Comm'n, CFTC Orders The Royal Bank of Scotland to Pay $85 Million Penalty for Attempted Manipulation of U.S. Dollar ISDAFIX Benchmark Swap Rates (Feb. 3, 2017), https://www.cftc.gov/PressRoom/PressReleases/7527-17.

[42]     Press Release, Dep't of Just., Royal Bank of Scotland Agrees to Pay $4.9 Billion for Financial Crisis-Era Misconduct (Aug. 14, 2018), https://www.justice.gov/opa/pr/royal-bank-scotland-agrees-pay-49-billion-financial-crisis-era-misconduct.

Laundering Regulations 2007 concerning ongoing monitoring, risk-sensitive ongoing monitoring, and enhanced ongoing monitoring between 2012 and 2016.[43]

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated.  The "Class" is defined as:

> All persons or entities who transacted in Treasury Futures or options on Treasury Futures traded on a domestic exchange or transacted in Treasury Securities in the Cash Market, during the period January 1, 2008 through December 31, 2018 (the "Class Period").

83.    Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf.  Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

84.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury Futures and options on Treasury Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct.  While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

---

[43]    Press Release, NatWest Grp. plc, National Westminster Bank Plc pleads guilty to breaches of Regulations (Oct. 7. 2021), https://www.natwestgroup.com/news/2021/10/national-westminster-bank-plc-pleads-guilty-to-breaches-of-regulations.html.

85.     Plaintiff's claims are typical of the claims of other Class members.  Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.  No conflict between Plaintiff and the Class members exists.

86.     Plaintiffs will fairly and adequately protect the Class's interests.  Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA and common law.  Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

87.     The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Questions of law and fact common to all Class members, include, but are not limited to:

a.     whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury Securities prices

b.     whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury Futures prices;

c.     the nature and duration of Defendants' manipulation of Treasury Futures and Securities prices;

d.     whether in doing so, Defendants unjustly enriched themselves;

e.     whether Defendants' conduct violated Section 22 of the CEA;

f.     whether Defendants' conduct acted to aid and abet CEA violations;

g.      whether Defendants fraudulently concealed their misconduct from Plaintiff and the

Class; and

h.      the appropriate class-wide measure of relief for Defendants' CEA and common law

violations.

88.     Class action treatment is a superior method for the fair and efficient adjudication of

the controversy, in that, among other things, such treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of evidence, effort, and expense that numerous individual

actions would engender.  The benefits of proceeding through the class mechanism, including

providing injured persons or entities with a method for obtaining redress for claims that might not

be practicable to pursue individually, substantially outweigh any difficulties that may arise in

management of this class action.

89.     The prosecution of separate actions by individual Class members would create a

risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

Defendants.

90.     Plaintiff is unaware of any difficulties that are likely to be encountered in the

management of this action that would preclude its maintenance as a class action.

**EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT**

91.     During the Class Period, Defendants actively, fraudulently, and effectively

concealed their collusion and manipulation of the Treasury Futures market.

92.     Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy

or sell Treasury Futures at a certain price, even though they secretly had no intent of transacting at

that level.  Never did Defendants disclose that they placed these orders to manipulate the prices of

those instruments.  Because of such fraudulent concealment, and the fact that Defendants'

26

manipulation is inherently self-concealing, Plaintiff and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

93.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before December 21, 2021, when Department of Justice announced Defendant NWMP pleaded guilty related to the same misconduct alleged here.

94.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and the Class.

95.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF

**Manipulation of Treasury Futures
in Violation of the Commodity Exchange Act
(7 U.S.C. §1, *et seq.* and Regulation 180.2)
(Against All Defendants)**

96.     Plaintiff incorporates all allegations by reference and reallege them as though fully set forth herein.

97.     During the Class Period Defendants intended to and caused unlawful and artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. §1, *et seq.*, through their use of manipulative buy and sell orders and other manipulative conduct.

98.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of a registered entity, in violation of the CEA.

99.     During the Class Period, U.S. Treasury Futures' prices did not result from legitimate market information and the forces of supply and demand.  Instead, Treasury Futures'

prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

100.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Treasury Futures.

101.     Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold at artificially inflated or deflated prices.

102.     Defendants had the ability to cause and did cause artificial prices of Treasury Futures.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury Futures and were aware of the effects of spoofing and other manipulative trading activities on those markets.

103.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

104.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

105.     Plaintiff and the Class are each entitled to actual damages sustained in Treasury Futures transactions due to the CEA violations alleged herein.

## SECOND CLAIM FOR RELIEF

**For Employing a Manipulative and Deceptive Device in
Violation of the Commodity Exchange Act, as Amended
(7 U.S.C. §§1, *et seq.* and Rule 180.1(a))
(Against All Defendants)**

106.    Plaintiff incorporates all allegations by reference and reallege them as though fully set forth herein.

107.    Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes the employment of a manipulative and deceptive device.

108.    Defendants acted intentionally – and, even if they are found to not have acted intentionally, then at least acted recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class.  The risk that Defendants' spoof orders and other manipulative trading activities could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Defendants' spoof orders and other manipulative trading activities were so obvious that Defendants must have been aware of it.

109.    Defendants knew that their spoof orders would appear in the order book and that traders often consider order book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

110.    Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

111.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on

those futures contracts, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

112.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

## THIRD CLAIM FOR RELIEF

### Vicarious Liability in Violation of the
### Commodity Exchange Act, as Amended
### (7 U.S.C. §§1, *et seq.*)
### (Against All Defendants)

113.    Plaintiff incorporates the all allegations by reference and reallege them as though fully set forth herein.

114.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

115.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against All Defendants)

116.    Plaintiff incorporates all allegations by reference and reallege them as though fully set forth herein.

117.    Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted false orders and employed other techniques to manipulate the prices of Treasury Securities and Futures in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiff's and the Class's expense.

118.    Defendants directly benefited from their manipulation of prices in the Treasury Securities and Futures markets.

119.    It would be inequitable for Defendants to be allowed to retain the benefits which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiff's and the Class's expense.

120.    Plaintiff and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

121.    In addition, each Defendant should pay restitution for its own unjust enrichment to Plaintiff and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class, prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiff as the Class representative and its counsel as Class Counsel;

(B)     For a judgment awarding Plaintiff and the Class actual and punitive damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues.

Dated: December 23, 2021

By:   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Joseph P. Guglielmo
Joseph P. Guglielmo (CT 27481)
Erin Green Comite (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
jguglielmo@scott-scott.com
ecomite@scott-scott.com

Thomas K. Boardman (*pro hac vice* forthcoming)
Louis F. Burke (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tboardman@scott-scott.com
lburke@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
cburke@scott-scott.com